UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


UNITED STATES OF AMERICA, )
            Plaintiff,     )
vs.                        )   Case No. 1:18-cr-00281-EJL-1
GLOUDINA MARIA ROBBERTSE,  )
            Defendant.     )
_____)


SENTENCING HEARING
HELD BEFORE THE HONORABLE EDWARD J. LODGE
AT BOISE, IDAHO
JUNE 11, 2019


A P P E A R A N C E S


FOR THE PLAINTIFF:

HEATHER PATRICCO, AUSA
United States Attorney's Office
800 East Park Boulevard
Suite 600
Boise, ID 83712


FOR THE DEFENDANT:

THOMAS MONAGHAN
218 West Village Lane
Boise, ID 83702


Reported by:
Lisa K. Yant, CSR, RPR, CFRR
Official Court Reporter

P R O C E E D I N G S

June 11, 2019 – Boise, Idaho

THE CLERK:  The Court will now the sentencing for USA vs. Gloudina Maria Robbertse, Case No. 1:18-cr-281-EJL.

Counsel, if you will please state your appearances.

MS. PATRICCO:  Heather Patricco for the United States. With me at counsel table is Homeland Security Agent Jarred Cronenworth.

MR. MONAGHAN:  Good morning, Your Honor.  Tom Monaghan on behalf of Gloudina Robbertse.  Thank you.

THE COURT:  Good morning, Counsel, and thank you.

Good morning, Ms. Robbertse.

THE DEFENDANT:  Good morning.

THE COURT:  Madam, the Court record shows that on December 6th of last year you pled guilty to Counts 15 and 33 charging wire fraud and aggravated identity theft and/or aiding and abetting.

Those pleas were entered pursuant to certain plea negotiations.  After the Court accepted your pleas, a presentence investigation was requested and so ordered by the Court, and the matter has been continued to this date for the purpose of sentencing.

Is that the way you recall the proceedings up to date?

THE DEFENDANT:  Yes, sir.

1          THE COURT:  You have had an opportunity to go over the

2    report with your counsel?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  You have noted, then, that the tentative

5    findings as to the recommended Guideline calculations are a

6    total combined offense level of 18, a criminal history

7    category I, which provides for a sentencing range on Count 15 of

8    27 to 33 months; Count 33, a two-year mandatory consecutive; and

9    it is one and three years supervised release on the two

10   different counts; a fine range between $10,000 to $100,000;

11   restitution in the amount of $475,350.28; and, a $100 special

12   assessment on each of the two counts for a total of $200.

13         Other than any written objections and/or motions that

14   may have been previously filed, do you have any dispute as to

15   the Guideline calculations?

16         THE DEFENDANT:  No, sir.

17         THE COURT:  Are there any witnesses to be called?

18         MS. PATRICCO:  Your Honor, the government does not

19   have any witnesses.  However, there is a victim, a Mr. Trevor

20   Kaplan, who would like to speak.  It is my understanding another

21   victim is in South Africa and cannot be here has written a

22   statement and asked Mr. Kaplan to read that as well.  He is a

23   victim as well, Petri Gilbert.

24         MR. MONAGHAN:  I don't believe Mr. Kaplan would be

25   entitled to read other victims' statements so we would

1 respectfully object to that.

2    THE COURT REPORTER:  Please use the microphone.

3    MR. MONAGHAN:  I was simply saying that we would

4 respectfully object to Mr. Kaplan reading statements of other

5 victims.  I think that is not provided for by the statute, but

6 we do not object.  I think that counsel for the government could

7 read those into the record on behalf of those individuals.

8    Thank you.

9    THE COURT:  It is a Court matter.  I am going to let

10 the witness make whatever statement he has to make.  He may come

11 forward, please.

12    Again, sir, use the podium, if you will, and pull that

13 mic over a little bit closer and speak right up so we hear you.

14    MR. KAPLAN:  Thank you, Your Honor.

15    For the record, my name is Trevor Kaplan from Utah.  I

16 drove six hours to be here for this court case.  And I am in

17 some way representing some of the other victims that cannot be

18 here today.  And so am I allowed to read Petri's statement?

19    THE COURT:  Has that letter been presented to the

20 Court?

21    MR. KAPLAN:  Yes.

22    THE COURT:  I have read it.

23    MR. KAPLAN:  So do I just read my own then?

24    THE COURT:  Yes.

25    MR. KAPLAN:  We came to meet Gloudina in about 2003.

Got to know her as an extremely resourceful person that operated on a thin line between ingenious and criminal in her dealings with individuals as well as banks, mortgage companies and other business entities. She is either the nicest person you will meet and she will do anything to help you or she'll blatantly lie to your face even while knowing that you know the truth.

The saddest part is that she is also the most vindictive person I have ever met in my life. She told me herself she will spend nights without sleep thinking of the most effective way to destroy a person in any way if they cross her path or go against her.

Yet she managed to convince me to go work for her in a credit repair loan originating company. After a few months, I realized if I keep working for her and operating the way she does business, I will end up in jail. Once employee checks started bouncing, while she bought expensive cars for the kids, expensive toys for the kids, for other people that she tried getting in good standing with, I realized that I was dealing with a sociopath and nothing is going to change her ways, no matter what.

At this point, I just have to say, Your Honor, I have to say I have 12 years of experience as a police officer, I have dealt with several criminals in my life. How sad then to find out she used her wit and charm to turn people against me and my family.

1    After my ex-wife and I stopped working for her and

2  distanced ourselves from her, we co-owned a South African import

3  store, a meat production plant, and of course we relied heavily

4  on the South African community with our business.  She went out

5  of her way to contact every person she could find that she knew

6  was a customer of ours and gossips and told all kinds of strange

7  stories to them.

8    One of the stories was that we supposedly fled the

9  country because there was an outstanding charges against me for

10  pedophilia and that our oldest son and myself are also on the

11  national sex offender list here in America.  That our son was

12  arrested for lewdness.  And, of course, these stories ended up

13  having the business fail.

14    I told my ex-wife and our son not to retaliate and let

15  it go.  Yet over the years it resulted in serious depression for

16  my ex-wife, anger management issues for my son, and even myself

17  ended up going to treatment for PTSD and severe depression after

18  everything we had been through in South Africa, but aggravated

19  by dealing with the situation with Gloudina.

20    That had all been done.  We thought it was in the past

21  and we would move on with our lives.  Towards the end of last

22  year, I was offered the opportunity to open an office for the

23  insurance broker in Utah for the biggest brokerage for National

24  Life, a 170-old country.  I passed the insurance exam without a

25  problem.  And to my surprise and anger, I found out the state of

Utah would not issue my insurance license because of the FBI and Homeland Security investigation against me. This resulted in my field trainer in the company, who moved from Phoenix to take over the position that I was supposed to have in Utah. That is a big potential income that I have lost. The license was eventually issued, but it cost me my position and credibility with the company.

During my visit in South Africa in November last year, I tried to get a copy of the police docket regarding the charges for rape, abduction, attempted murder, extortion, etc. This is for my ex-wife Renae who is in court here today.

Gloudina went out of her way to tell people that Renae was never raped, there was no such case. And the case number, I have it here, MAS 1007-09-1996. I couldn't get a copy on short notice from the police and they said I would have to get it through the FBI and Interpol.

The most important thing I want to bring across to the Court is that Gloudina has no respect for the law or the rules of society. She has total disregard for the destroyed lives she left in her wake as long as she gets what she wants and feels she deserves.

I would like to see her to get a sentence that she deserves. She uses the excuse that her father was murdered and that turned her into doing the things she does. Your Honor, here is Renae that has been raped after a murder attempt. I had

1    two attempted carjackings with a gun in my face.

2          When we came here, we started from scratch.  We had a

3    really tough time financially but we did not resolve to criminal

4    activity to make our lives better, to live a life of luxury.

5    She had five-star treatment wherever she went at the cost of

6    others.  We worked hard for where we were at, to finally be

7    successful financially where we could eventually retire without

8    criminal activity.

9          I want the Court to know that we are here today

10   because as victims we have been affected, our lives have been

11   changed, but so have many others, but they cannot be here today

12   to show their face in front of the Court.

13         Thank you, Your Honor.

14         THE COURT:  Thank you.

15         Any other witnesses?

16         MS. PATRICCO:  Not for the government, Your Honor.

17         MR. MONAGHAN:  No, Your Honor.

18         THE COURT:  Does the government have a recommendation?

19         MS. PATRICCO:  Yes, Your Honor.

20         May it please the Court.

21         THE COURT:  Counsel.

22         MS. PATRICCO:  The government is recommending that the

23   Court sentence the defendant to a term of at least 54 months

24   imprisonment.  That is a combination, Your Honor, of a

25   two-year-minimum mandatory required for aggravated identity

1    theft in addition to 30 months for wire fraud.

2          As set out in the PSR, the defendant was charged with

3    a 37-count Indictment of conspiracy to commit wire fraud, wire

4    fraud and aggravated identity theft.  Despite these very serious

5    charges, Your Honor, the Defendant continued with her unlawful

6    conduct.

7          Defendant's initial appearance on the Indictment was

8    held on September 17th of 2018 at 10:30 a.m. before U.S.

9    Magistrate Judge Candy W. Dale.  At that time, conditions were

10   set.  Judge Dale told the defendant she must not violate any

11   federal, state or local laws while on release.

12         On that day, Your Honor, the defendant looked into the

13   eyes of Judge Dale and agreed to abide by these conditions of

14   her release.  That same day, a mere seven hours later, the

15   defendant was seen at an ATM in Meridian, Idaho withdrawing

16   funds from an account of an unwitting victim, committing another

17   act of aggravated identity theft and wire fraud.  That is all

18   you need to know about the character of this defendant, Your

19   Honor.

20         And with that in mind, Your Honor, I would like to

21   walk through the 3553(a) factors which set forth what the Court

22   should consider when imposing a sentence.  I apologize to the

23   Court, did hear a little bit of the facts previously when we

24   were sentencing her co-defendant, but I would like to walk

25   through them here again for purposes of this record, Your Honor.

1    The nature and circumstances of the offense.  This was

2    a long-running-fraud scheme that spanned over three years.

3    While living in California, the defendant devised and executed a

4    scheme to defraud the California Employment Development

5    Department, CEDD.  CEDD is a state agency that is devoted to

6    helping those who are unable to work due to illness, injury or

7    pregnancy.  The state program is funded through employee-

8    payroll deductions of California workers.

9    The plan was to get CEDD to pay out money for false

10   disability claims on behalf of unwitting individuals.  This was

11   a massive fraud scheme, Your Honor.  It involved theft of over

12   $475,000 from the state of California with numerous identity

13   theft victims.

14   It worked like this, Your Honor.  The defendant and

15   her co-defendant filled out disability claim forms to obtain

16   disability claim benefits with CEDD.  These claims were

17   submitted using identities of a real person.  The victims of the

18   identity fraud had no knowledge and did not approve these

19   filings, Your Honor.  In many cases, the defendant and her

20   co-defendant personally knew the individuals they were

21   impersonating.  And in many other cases, defendant purchased the

22   name and personal information from the Internet.

23   Defendant told federal agents that she used names and

24   personal information of people that quote, "owed her money" or

25   quote, "spread rumors about her" or quote, "lied to her."  And

1    in some cases using the victim's identity was merely convenient

2    or "collateral damage," her words.

3         The claim form filed with the CEDD included personal

4    identifying information to include names, birth dates, Social

5    Security numbers of the victims.  As provided in Attachment A to

6    the government's sentencing memorandum, agents found more than

7    25 pages of handwritten notes with personal identification

8    information of victims of the fraud scheme at the defendant's

9    home the day it was searched.

10        Not only did the defendant use the names and personal

11   information of real persons to submit the claims, she also used

12   the names and information of practicing physicians.  Your Honor,

13   in order to request disabilities from the benefits from CEDD,

14   the claim form required a quote, "physician/practitioner

15   certificate."  That certificate included the treating

16   physician's name, their address, the date of treatment that they

17   provided to the person, the disability, and the date the

18   disability rendered the patient incapable of performing his or

19   her job as well as a signature of the physician.  One of these

20   claim forms is attached as Attachment B to the government's

21   sentencing memorandum, Your Honor, as a sample.

22        Defendant falsified all of this information.

23   Defendant found the names of physician on Google, signed the

24   physician's name at the bottom of each claim form.  Defendant

25   and her co-defendant used different physicians on claim forms so

1    it did not raise suspicions with the CEDD, but none of the

2    victims of the fraud scheme were patients of these physicians.

3         The injuries defendant used on the claim forms were

4    also false.  Defendant researched injuries online to use on the

5    claim forms, even going so far as researching medical codes that

6    are used by physicians for these types of injuries.

7         After filing the fraudulent claim forms, the defendant

8    routinely checked on the status of false claims that were filed.

9    Review of one of the defendant's computers revealed the

10   defendant checked various fraudulent claims approximately 870

11   times during a six-month period at the end of 2017 and beginning

12   of 2018.

13        It was not just that the defendant filed these false

14   claim forms, the defendant used companies that she controlled or

15   incorporated as the employer companies for purposes of claiming

16   benefits on behalf of the individuals she was impersonating.

17        So, in other words, Your Honor, in order to claim

18   benefits on behalf of the fictitious employees, she was required

19   to indicate the employee's place of business and the last time

20   they worked prior to disability.  The defendant used her

21   companies, Kipper (phon.) Tech International; Falcon Group;

22   United Financial Services Group; JHC Financial, LLC; CTD

23   Construction; and, Ceramic Tile and Design as places of

24   employment for these victims.  These quote, "employees" did not

25   work for these companies and did not have the claimed

1    disability; it was all false.

2         Now, once the claim was approved by the CEDD, the CEDD

3    loaded the debit card with money so the claimant, when they

4    received the debit card, could withdraw money out of a bank of

5    their choosing.  The debit card had the name of the claimant on

6    the front of the card.  These CEDD debit cards were sent to one

7    of several commercial mailboxes utilized by the defendant and

8    her co-defendant in furtherance of the fraud.

9         The defendant paid for these commercial mailboxes

10   solely for the fraud scheme.  At one time, the defendant had at

11   least four mailboxes set up in California so she could receive

12   the CEDD debit cards.  Those debit cards were then sent to

13   commercial mailboxes in Idaho or to the defendant's residence.

14   Defendant and her co-defendant would pick up the cards from the

15   mailboxes.  The cards would then be activated and a PIN number

16   was established for them.  The PIN number was the same for all

17   CEDD debit cards.  Thereafter, the defendant or her co-defendant

18   withdrew money from the CEDD debit cards at banking institutions

19   in California and/or the District of Idaho for their personal

20   use.

21        This was a fraud, Your Honor, that continued over a

22   period of years and would not have stopped had agents not

23   uncovered it.  Review of electronic media of the defendant and

24   her co-defendant revealed hundreds of messages discussing the

25   use of these commercial mailboxes, discussing victims' claims

1    that were under review by the CEDD.  And when a claim became

2    suspicious, the defendants would discuss what was going on with

3    the claim and whether the claim was dead or not.

4         One such example is set forth in the government's

5    sentencing memorandum.  And in that case, Your Honor, the

6    defendant and her co-defendant discuss victim cards, splitting

7    up the money, and how to continue in their fraudulent acts.

8         Defendant also routinely used spoof cards, Your Honor.

9    Spoof cards let you change the caller ID to reflect their number

10   or to change your voice.  For example, Your Honor, the defendant

11   used spoof cards to change her number or her voice to a man if

12   she had to call the CEDD about a male victim.  One of the text

13   messages provided in the government's filing is between the

14   defendant and her co-defendant where they are discussing a male

15   identity theft victim and discuss the spoof cards.

16        The nature and circumstances of this crime, Your

17   Honor.  The defendant employed whatever measures were necessary

18   to defraud CEDD of their money.  The defendant did not intend to

19   stop her illegal activity as alluded to previously, Your Honor.

20   The defendant committed additional acts of wire fraud and

21   aggravated identity theft after indictment.  One act of wire

22   fraud and aggravated identity theft occurred seven hours, as I

23   stated, after Judge Dale had released her.

24        There were five additional acts of wire fraud and

25   aggravated identity theft that occurred not only on the

September 17th date that I referenced, but on the 18th, the 19th, the 20th, the 21st, and then again on the 24th of September of 2018.  Over $5,000 was taken from just that one card.

Defendant wanted the money so she used the CEDD debt card in the name of the victim D.J.  D.J. had hired the defendant to fix his credit over ten years prior.  He didn't have a disability and he certainly didn't file any claims with the CEDD.

Defendant meticulously planned and carried out this fraudulent disability benefit scheme for so many years and amassed over $475,000.  Defendant's conduct was serious and caused credit and other financial issues for victims of her fraud.

Your Honor, I will briefly touch on the history and characteristics of the defendant.  We believe it does support a sentence of at least 54 months.  The defendant is currently a lawful permanent residence in the United States.  She has a bachelor's of arts degree as well as a master's degree in business administration.  Defendant knew right from wrong.  She is an educated woman.  She used her knowledge of business to further her fraud scheme.

This was not the defendant's first encounter with the law.  Defendant previously was convicted in Salt Lake County, Utah for issuing bad checks in 2006.  Again, in October of 2018

1    defendant was charged with 28 counts of fraud in Riverside

2    County, California related to her fraudulent filed claims under

3    the California Unemployment Insurance Code.

4         Defendant had no intention of stopping.  She was well-

5    aware that she was under criminal investigation in February of

6    2018 when federal agents executed a search warrant of her house

7    and seized electronic media and business records.  Yet despite

8    this, the defendant continued to file claims with the CEDD.  She

9    continued to use the identity of real persons and continued to

10   obtain money from withdrawals made using the CEDD debit cards.

11        Defendant's actions and words, through text messages,

12   filing false claims, demonstrate defendant's true character.

13   She is a woman that wanted money with little regard for those

14   she hurt in the process.  When the opportunity presented itself,

15   defendant defrauded a state agency devoted to helping disabled

16   workers obtain benefits.

17        Your Honor, I am going to briefly address the terms to

18   criminal conduct and respect for the law.  As stated in the

19   government's sentencing memorandum, white-collar defendants are

20   particularly susceptible to deterrence.  White-collar crime is

21   pre-mediated and often sophisticated.  White-collar criminals

22   engage in a cost-benefit analysis.  Unless the cost is great

23   enough, these criminals are not deterred.  Defendant's conduct

24   enabled her to obtain quote, "benefits" of over $400,000.

25        Defendant was not deterred when the federal agents

came to her home.  She was not deterred by a federal indictment, she was not deterred by the admonishment of Judge Dale to not commit further crimes.  The defendant needs to respect the law. White-collar criminals need to understand when you commit a crime, the cost is greater than the benefit.  A just sentence here, Your Honor, to provide deterrence to others from engaging in this type of conduct and send a message to this defendant that her actions will not be tolerated and that actions have criminal consequences.

Your Honor, at this time I just want to briefly mention that the government is not moving for a 5K downward departure.  The government only mentions this at sentencing because the defendant, in her sentencing memorandum, references that she has tried hard to provide substantial assistance in this case and that that should be taken into account when going through the 3552 factors.

It is worth noting, however, Your Honor, in the defendant's debrief with agents, she claimed that other victims in this case were, in essence, co-conspirators in the fraudulent claims to the CEDD.  However, during Mirandized statements of the defendant shortly after agents conducted a search warrant of her residence, the defendant stated the exact opposite, referring to these victims as innocent and not involved in this criminal activity, thus, Your Honor, calling into question her veracity.

1          There are no 3553(a) factors in this case that

2     mitigate against the imposition of the sentence within the

3     United States Sentencing Guideline range.  To the contrary.

4     3553(a) factors on balance support the imposition of the

5     recommended Guideline sentence.

6          Accordingly, Your Honor, the government recommends a

7     sentence of at least 54 months of imprisonment.

8          Thank you.

9          THE COURT:  Thank you.

10         Mr. Monaghan.

11         MR. MONAGHAN:  Thank you, Your Honor.

12         May it please the Court, Your Honor.

13         THE COURT:  Counsel.

14         MR. MONAGHAN:  Your Honor, we are respectfully asking

15    the Court to impose a sentence of 44 months, which would be a

16    variance of seven months below the low end of the advisory

17    Guideline range and ten months below the government's

18    recommended sentence of 54 months.  It is our position, Your

19    Honor, that sentence would be sufficient but not greater than

20    necessary to accomplish the goals of 18 U.S.C. 3553.

21         Your Honor, I want to begin by addressing the victim

22    impact statements and the statement of the gentleman who

23    addressed the Court this morning.  We fully recognize there is a

24    statute that provides, valuably, that victim impact statements

25    such as the ones this Court has received are to be considered as

part of the sentencing process.

I simply want to note from a defense standpoint it does present a difficult situation. While victims have the right to be heard, the defendant does not necessarily have the right to subject those individuals to cross-examination to explore their motives.

There is also obviously a concern if a defendant tries to point out a victim's motives, that can be perceived by the Court as attempting to deflect blame or not accepting responsibility for their own actions. So I simply ask the Court to bear in mind that we have elected to focus this hearing on what we believe is most important. That is, the criminal conduct that Gloudina has pleaded guilty to and that is reflected in the presentence report as well as her acceptance of responsibility for that conduct.

Your Honor, we agree with the presentence report's calculation of the advisory Guideline range as being 51 to 57 months. I know some of the letter writers of the victim impact statements expressed outrage that Ms. Robbertse only pleaded guilty to two counts. And while I think it is reasonable and understandable for the public to perceive that as somewhat lenient, those of us who work in the federal criminal justice system know that federal sentencing requires the Court to take into account the entirety of her criminal conduct, and that is what has been done and what is captured in the

1    presentence report.

2        Now, was it a favorable Plea Agreement, yes, I would

3    say so.  But does it mean that she is not being held accountable

4    for her broader conduct in this case and the answer, of course,

5    is no.  The loss amount that we are dealing with covers not just

6    the counts that she pleaded to, but loss from the entire scheme,

7    and there was an enhancement for the number of victims involved

8    in this case.  In addition, of course, to the wire fraud

9    Guideline range, she is required to -- the Court is required to

10   sentence her to an additional 24 months consecutive to the 27 to

11   33 months for the wire fraud.

12       I would also note that because of her immigration

13   status, Your Honor, Ms. Robbertse will not be allowed to go to a

14   half-way house for up to the last year.  Typically it has been

15   six months or so for other defendants who are citizens, but she

16   will not be allowed to do that in her case.

17       Your Honor, I think that if all the Court was to

18   consider was the discovery in this case and the sentencing memos

19   of counsel, one would think all there is to Gloudina Robbertse

20   is criminal conduct and fraud.  And, in fact, my respected

21   adversary and colleague, Ms. Patricco, indicated that is all you

22   need to know of Gloudina's character.  With respect, I disagree.

23       Your Honor, we outlined the trauma that Gloudina went

24   through when she was growing up.  She was engulfed in the race

25   turmoil produced by the South African government's policy of

1    apartheid, which was forced racial segregation and

2    discrimination.  Although the world eventually became aware of

3    what was happening in that country, Gloudina and her family

4    lived through the chaos and the rage and wrath of that nation.

5         When she was 16, in the height of the discord that

6    apartheid produced, her beloved father was murdered by rioters

7    after having given a funeral for a man killed in the race riots.

8    It had a profound impact on her.  People react differently to

9    trauma such as that, but she was deeply impacted by the violent

10   murder of her father and having had her father taken away from

11   her brutally, and it changed her, I would say.

12        She also saw the impact of his death on her mom and

13   her younger adopted brother who also had mental health issues

14   and anger of his own.  She saw the family struggle facing

15   poverty and her brother's already significant anger problems

16   were immensely exacerbated.  I think it is fair to say she was

17   frustrated by the way her and her family had to suffer.

18   Mr. Kiiha also spoke about this a little bit in his remarks on

19   behalf of Chantelle, Gloudina's daughter and co-defendant.

20        Your Honor, as Gloudina candidly admitted, and as

21   reflected in the presentence report, her father's murder made

22   her into a racist, as she put it.  She blamed the race rioters

23   for his death as well as the death of a neighbor who was also

24   violently killed during the race rioting.  And when she was 22,

25   she lost her mother as well, this time through illness, and that

happened only three weeks before she married her husband Henry.

When she came to the U.S. in 1998, she and Henry were subject to exploitation because of their immigrant status, not often get paid for work she did for employers. And then she began working for a man, whose name is reflected in the presentence report, who was an unscrupulous businessman engaged in fraud where she learned the methods involved in this criminal conduct.

In 2014 Gloudina became ill and applied with the CEDD for disability and she was denied. However, she eventually won an appeal on that disability claim, but for a time her family was without funds and living in a motel. And at that time her beloved dog Stanley was killed. And that might seem trivial to some, but I can tell the Court this had a huge impact on her. She used to wear a locket with his photograph inside after he died and she felt basically that another loss had occurred, another loved one was taken from her.

I can tell the Court, even now when I speak to her about it, she becomes emotional. She reacted in what I would characterize as a terrible way. She wanted to take from the CEDD that she blamed for this loss. In other words, because of them denying the disability claim, the circumstances arose where Stanley died. And I will tell the Court that, frankly, is it rational? No. But trauma such as that which she has endured is often irrational, and she took out her anger and grief on the

1 system.

2    Why did she continue, as counsel for the government

3 points out, to engage in conduct related to this offense conduct

4 even after the investigation commenced and even after being

5 released?  Well, she is undisputedly bright.  She is an

6 intelligent person, but an intelligent, rational person would

7 not have done what she did at that point.  She knew that there

8 was an investigation, as counsel points out, in February 2018

9 when her home was raided and she knew she had been charged and

10 let out by Judge Dale after arraignment.

11    Your Honor, I respectfully maintain that what looks

12 like intransigence is actually a product of mental health

13 concerns related to the trauma that she suffered as a young

14 person.  Her uncle's letter basically echoed that in his letter

15 of support to the Court.

16    Your Honor, the Court put her in custody many months

17 ago after she pleaded guilty, and I think it is fair to say she

18 has had time to reflect and realizes the wrongfulness of her

19 actions.  She will address the Court herself, but I do believe

20 there is remorse here.  She expressed the pain that she feels at

21 having involved her child, her daughter Chantelle, in this

22 scheme.  She loves her daughter.  She loves all of her children,

23 her husband and the knowledge that she brought Chantelle into

24 this is punishment she will have to live with.

25    I know there was discussion about Chantelle was well-

aware of what she was doing and was an adult at the time, but, of course, Gloudina feels responsible for involving her.

Your Honor, the death of her father is not being presented as an excuse because Gloudina pleaded guilty to very serious crimes and she is going to go to prison. This is not a situation where we hear about white collar defendants simply getting a slap on the wrist and going free. Despite all of what has been talked about today, she has been in this country 21 years and she has the lowest criminal history category that exists. She will still go to prison for over three, four years, which is a very long time for somebody at her point in life who has never been in trouble with the law in this country ever in the past.

Your Honor, I think that there are -- there is more to Gloudina Robbertse than what is reflected in this criminal conduct. Despite the wrongful things she did, she has great love for family and compassion for others. She has given to friends, family and charitable organizations over the years.

And one example is that, which I included in our sentencing memorandum, she befriended a woman, a troubled woman, some time ago who she tried to help. And as a result, she essentially became -- she took care of that woman's daughter Nevaeh and Evette who also goes by Olivia. Chantelle took the step of actually adopting Olivia, Gloudina took Navaeh and they are the apples of her eye. They are, of course, children who

are African-American and I think that shows the potential for

change.  That this woman, who became racist, as she put it,

after suffering such a horrible loss was able to extend her love

and open her home to children that weren't even hers.

There is more to Gloudina than her crimes and we ask

the Court to take that into consideration.  I can tell the Court

personally after my father passed at the end of April, she and

Chantelle as well showed me great kindness.

Your Honor, I would note she did cooperate fully with

the investigation, she met with investigative agents many times

and incriminated herself along the way.  Afterward, she did meet

to debrief, but she also provided information that she learned

of other crimes.  I am not going to go into detail about that

simply because there may be ongoing proceedings related to that.

But I think that it shows that even though she might

not get a 5K departure for that cooperation today, she has been

trying to do the right thing.  I think her attempts at

cooperation are important 3553 considerations.  I think they

speak to the statute's requirements that the Court impose just

punishment.  Forty-four months would be substantial punishment,

Your Honor, as required or just punishment as the statute

requires for Gloudina who has never been in custody prior to

this.

Your Honor, in *Padilla vs. Kentucky*, the Court

essentially echoed the Supreme Court's position in that case

where they stated, "As a matter of federal law, deportation is an integral part, indeed sometimes the most important part, of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes."

Because of her convictions, Gloudina faces the loss of her LPR status and deportation from the U.S. and permanent exile from this country where she has made her home for 21 years. That is an enormous additional punishment that we ask the Court to consider today when determining the appropriate sentence and it certainly impacts the 3553 considerations. "It is," by the Supreme Court's own words, "a harsh punishment, possibly worse than the imprisonment itself, because it is permanent and lifelong."

Her family members are here, her husband Henry and her children Henry, Jr., Chantelle and Beatrice. And while Henry, Sr. may elect to go back to South Africa to be with Gloudina and while Chantelle may face -- will likely face her own immigration consequences, Beatrice, her eldest daughter, has her family here and, of course, Gloudina will be separated from them.

I think that that is important, Your Honor, because it also shows there is not a need for a longer sentence to protect the public. She simply is not going to be in this country. I don't think she will ever be free again in the United States. My experience in these cases, the immigration authorities lodge a detainer. And after she serves her sentence, she will likely

go into their custody where she will immediately be placed into deportation proceedings. I don't think she will hit the street at all. And, frankly, under immigration law, relief available to her, I am not an immigration practitioner, frankly, but it is very, very limited. I don't know that she will have any relief available.

We have reached out to immigration counsel, but I have not heard anybody tell me yet that there is an avenue for her to remain in the United States. She will be going back to South Africa where she lost her father and where there is now turmoil again, from what I read in the news. She will have to give up her home of the last 21 years and readjust to a nation that she hasn't been part of for over two decades and that is, again, harsh punishment.

And she does face prosecution in California for essentially the same conduct or similar conduct. The Plea Agreement did indicate that if she received 48 months minimum here, they would recommend a concurrent sentence I believe of that duration and allow her or recommend that she be allowed to serve her time in federal custody, and we appreciate that.

I did speak with that gentleman, the prosecutor in that case, his name is Matt Roberts. He indicated that under California sentencing statute or scheme essentially there is a low, medium, and high categories that they do, sort of similar to the federal system, but they have low, medium and high

1    instead of categories I through VI for criminal history.  And he

2    indicated that he calculated, based on the way she is currently

3    charged, that she would face a sentence of three years and eight

4    months on the high end.  And he indicated that if we requested

5    44 months, which is the three years and eight months, that would

6    not cause him to deviate from the agreement that is in the

7    federal Plea Agreement.

8         So that is the basis for my request today for

9    44 months.  And, in fact, because we believe, respectfully, that

10   would be sufficient but not greater than necessary to achieve

11   the objectives under 18 U.S.C. 3553, taking again into

12   consideration the fact that she, most likely, will never be,

13   most likely, permitted to return to this country.

14        Thank you very much, Your Honor.

15        THE COURT:  Thank you.

16        Ma'am, did you have anything you want to say to the

17   Court?

18        THE DEFENDANT:  Dear Judge Lodge -- I just have a

19   statement to read and then I will say something afterwards.

20        I wanted to thank the Court for the opportunity to

21   address the Court.  I can give you a lot of reasons why I did

22   what I did, but they all sound like excuses and I do not want to

23   make any more excuses than what I have already done.

24        The truth is, I have made a horrible mistake.  One

25   that I will never forgive myself for.  I stand ashamed and

1    embarrassed in front of God and my family, the Court and my

2    community.  I allowed greed to cloud my judgment and in the

3    process, force my family and my victims great pain and sorrow.

4         It was never my intention to do something so extremely

5    drastic, although I believe what happened was because I have

6    trauma that occurred to me.  I was angry and I felt guilty and I

7    tried to fix it.  All I can do is beg for forgiveness and ask

8    the Court for the opportunity to make this right.  I have to do

9    something to repay the state of California.  I have always been

10   a strong and self-confident person, but I need to find a way to

11   redeem myself to my family and those that I have hurt.  I want

12   to seek therapy and work toward bettering my life.

13        I want to apologize for inconveniencing the Court and

14   the federal government.  I accept full responsibility for my

15   actions.  I would do anything to take back what I did.  My

16   actions have already caused my family so much harm.  During my

17   time incarcerated I realized that crime doesn't pay.  And when I

18   am released I intend to conduct myself in society in a manner

19   that would be upstanding and beneficial to the community.

20        And then I wanted to say, Judge Lodge, whatever

21   sentence you give me today, I am content with it, I have my

22   peace with it.  I am going to accept it.  I want to say thank

23   you to the prosecutor.  Thank you for the generous Plea

24   Agreement.  And Tom, the support and the work we have done

25   together to bring this to closure.

1        Whatever your sentence is, I am content with it.  I

2   know I have made a mistake and I know I have to be punished for

3   it, and that is what I accept.

4        THE COURT:  Thank you, ma'am.

5        You are obviously saying the right thing.  The issue

6   is whether you are going to do the right thing, because your

7   history shows that you may say one thing and do something else.

8   Actions obviously speak louder than words.  You have a track

9   record that does not speak well of you, because you have been

10  given a good brain, you are obviously a person that others look

11  up to in many respects because you have been able to do the

12  things that you have been able to do while leading others.

13       But there is a consequence to be paid.  When you use

14  bad judgment, obviously the chickens come home to roost.  The

15  damage that has been done is not something that this Court is

16  capable of rectifying.  The only thing that could even come

17  close to trying to take some steps to change what has happened

18  is by doing and using good judgment in the future.

19       You have a reputation that is going to be difficult to

20  deal with because when people look into it, they are going to

21  see that there is good reason not to take you at your word.  So

22  you are going to have to do something over and above that to be

23  able to now convince people that you really have changed and

24  that you really intend to do the right thing.

25       Counsel on both sides did an excellent job in this

case and they certainly covered the issues.  I don't know that I
can say or do anything that would go beyond what they have said.
They have painted the picture clearly.  It is obvious, you can
see it.  But you also have been given a good brain, obviously.
The question now is, how you are going to use it?

Your reputation is like the tail on a swallow, it
follows you wherever you go.  You have a big hurdle now to
overcome because people are going to check into your past.  They
are going to know that you are going to have to do something
that is different than what the track record is.

In this case, Counsel covered it well, I think, the
big issue in the 3553(a) factors is deterrence.  You cannot
sweep these things under the rug, because there is a lot of
thought put into it.  You know what the consequences are going
to be if you get discovered, and you just used extremely bad
judgment in this case time and time again.

As counsel pointed out, this Court's hands, I feel,
are basically tied, because when you were released by the
magistrate court, you didn't even comply with her instructions
and that is just something that is totally inexcusable.  So you
have to look yourself in the mirror and if you don't like what
you see, nobody else is going to like what they see.  You can
lie to others, but you can't lie to yourself.

You have taken advantage of people.  You put your
daughter that you were in here, I believe, or heard at least

what has happened to her life. So it doesn't just stop with

money. It goes far beyond money. It basically destroyed and

ruined other people's lives, people's businesses, their

reputations, and that is why deterrence is so important in a

case of this nature.

It doesn't make any difference whether it is 46 or 56

or 66, it is miniscule in comparison to the responsibility you

have to be a better person than you might have otherwise been.

You have this amount of money to pay, $475,350.28. It

is not going to go away. It doesn't make any difference how

long you are in the penitentiary, it is not going away. If you

use your scheme and the things that you have done to try and pay

for that, you are going to pay double, because you are just

going to have to do this through hard work and labor.

While it may not be realistic, you are going to get

everything paid. When you have put in your time under the

criminal law, it is just going to be moved over to the civil

division. It is going to be a roadblock, as I mentioned before.

So you have to do everything you can. I don't know whether you

have anything that you can sell or do to try to pay those things

off, but they are not going away, but it doesn't give you the

right to try to do something that is unlawful.

We are a country of laws, not of men. And you don't

come to this country from some other country that is having many

troubles and try and destroy our country. You have a big

responsibility when you come to be the type of person that you
moved here to really be, and that is be a good citizen, and
understand the rights of other people.

I think actually the sentence in this case is very
easy. The Court is going to sentence you on Count 15 to
30 months. Count 24, obviously, is a consecutive sentence of
33 months, so we are talking a total of 54 months. Again, what
you need to do is not worry about whether it is 48 or 54, it is
to do your time in a constructive manner. Keep your daughter
and granddaughters in mind, what damage you have done there.
You listen to the right people. You do not go into the
penitentiary and listen to other people that are being
convicted. They wouldn't be there if they were as smart as they
think they are. You listen to right people. You do the right
thing. You try and better your education. You are obviously a
smart person, but education is power. It gives you the
opportunity to do things you could never do otherwise, but you
have to do it in the right way.

It will be followed by supervised release, one year on
Count 33 and three years on Count 15. When you are under
supervised release, obviously there are certain things that you
must comply with.

THE COURT: Counsel, I want you to be sure you go over
these with the defendant so there can't be any misunderstanding.

MR. MONAGHAN: Yes, Your Honor.

1        THE COURT:  When you are under supervision, obviously,

2      you must comply with the mandatory, standard and special terms

3      of supervised release as stated in Part D of the presentence

4      report with the exception of the drug testing.  It doesn't

5      appear that is an issue.  It is a costly matter and it is going

6      to be stricken.  That doesn't mean it couldn't be reimposed if

7      there is some indication to the Court that again you are using

8      bad judgment by drinking or using drugs.

9        There is a $100 special assessment on each of the

10     counts for a total of $200.  The Court is not going to impose a

11     fine because it is absolutely essential that you start as soon

12     as you can paying towards the obligation that you have created.

13        There is a lot more that could be said, but I think

14     counsel did an excellent job, as I have indicated.  The main

15     thing is do not bog down in self-pity.  Go in there and be the

16     best person that you can be.  And even if you are deported, you

17     can take a lot of information -- you can take your training and

18     experience hopefully that you might get through the

19     penitentiary -- back with you.  But again, you just have to live

20     with the fact that you are a suspect and you are just going to

21     have to rise above it.

22        If you disagree with the Court's judgement you have 14

23     days in which to appeal.  You do that by filing your notice of

24     appeal with the Clerk of the Court in this district.  Otherwise

25     it is waived, meaning it is gone.

1          MS. PATRICCO:  Your Honor, I would just say you have

2     sentenced the defendant on Count 15 and Count 33.

3          The government would move then to dismiss Counts 1

4     through 14; Counts 16 through 32; and, Counts 34 through 37.

5          THE COURT:  So ordered.

6          MR. MONAGHAN:  Your Honor, we would respectfully ask

7     the Court to waive interest on the restitution amount because I

8     think it would rapidly become unobtainable.

9          Thank you.

10          THE COURT:  I respectfully deny that request.  It is

11     just something that the Court feels needs to be addressed for

12     what it is and that is not just the payment, but what the people

13     are actually out-of-pocket, and that is the money, plus

14     interest.

15          Thank you very much.

16          If I didn't say it, the supervised release is

17     concurrent.

18          (Whereupon, proceedings concluded.)

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

I, LISA K. YANT, CSR, RPR, CFRR, certify that the foregoing is a correct transcript of proceedings in the above-entitled matter.

/s/  Lisa K. Yant                    05/05/2020
_____      _____
LISA K. YANT, CSR, RPR, CFRR              Date